<pre>
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF KENTUCKY
 2                     LOUISVILLE DIVISION


 3

 4   B.L., et al.,                )
                                  )
 5          Plaintiffs,           )    Case No. 3:18-CV-151
                                  )
 6      VS.                       )
                                  )
 7   BRADLEY SCHUHMANN, et al.,   )
                                  )    January 16, 2020
 8          Defendants.           )    Louisville, KY

 9


10                     *  *  *  *  *

11            TRANSCRIPT OF STATUS CONFERENCE
              BEFORE HONORABLE COLIN H. LINDSAY
12              UNITED STATES MAGISTRATE JUDGE

13                     *  *  *  *  *

14   APPEARANCES:

15   For Plaintiff B.L., et al.:
                              Lindsay A. Cordes
16                            Louis Carl Schneider
                              Thomas Law Offices, PLLC
17                            9418 Norton Commons Blvd., Suite 200
                              Louisville, KY 40059
18

19
                         April Dowell, RMR, CRR
20                      Official Court Reporter
                         232 U.S. Courthouse
21                      Louisville, KY 40202
                            (502) 625-3778
22

23   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
24

25
</pre>

APPEARANCES
(Continued)

For Defendant Schuhmann:

                    Carol S. Petitt
                    Vaughn Petitt Legal Group, PLLC
                    7500 W. Hwy. 146, Suite 100
                    Peewee Valley, KY 40056

For Defendant Betts:

                    Kayla M. Campbell
                    William H. Brammell, Jr.
                    Dressman Benzinger La Velle PSC
                    321 W. Main Street, Suite 2100
                    Louisville, KY 40202

For Defendant Wood:

                    Bradley Robert Palmer
                    Conliffe, Sandmann & Sullivan
                    325 W. Main Street,
                    2000 Waterfront Plaza
                    Louisville, KY 40202

For Defendant Flaherty:

                    Lee E. Sitlinger
                    Sitlinger & Theiler
                    320 Whittington Parkway, Suite 304
                    Louisville, KY 40222

For Defendant Schmidt:

                    James M. Gary
                    Weber & Rose, PSC
                    471 W. Main Street, Suite 400
                    Louisville, KY 40202

For Defendant Louisville Metro Police Department:

                    Annale Renneker Taylor
                    ALSO PRESENT: Anne Frye
                    Jefferson County Attorney
                    531 Court Place, 8th Floor
                    Louisville, KY 40202

For Defendants Lincoln Heritage Council, Inc. Boy Scouts of
America and The Boy Scouts of America:

                    Caroline C. Phelps
                    Marc S. Murphy
                    Neil E. Barton
                    Stites & Harbison, PLLC
                    400 W. Market Street, Suite 1800
                    Louisville, KY 40202

```
 1                          APPEARANCES
                           (Continued)
 2

 3    For Defendant City of Louisville, Jefferson County/Louisville
      Consolidated Government:
 4                          Annale Renneker Taylor
                            (See above for address)
 5                          Jeffrey K. Phillips
                            Steptoe & Johnson PLLC
 6                          2525 Harrodsburg Road, Suite 300
                            Lexington, KY 40504
 7
      For McNary & Associates, LLC:
 8                          Michael A. Noll
                            Noll Law Office, PLLC
 9                          2843 Brownsboro Road, Suite 212
                            Louisville, KY 40206
10
      For Defendant Gelhausen and Consol Defendant Scott:
11
                            James P. Dilbeck, Jr.
12                          Dilbeck & Myers, PLLC
                            8005 Lyndon Centre Way, Suite 201
13                          Louisville, KY 40222

14    For Consol Defendant Paris:
                            Joseph C. Klausing
15                          O'Bryan, Brown & Toner, PLLC
                            401 S. Fourth Street, Suite 2200
16                          Louisville, KY 40202

17

18

19

20

21

22

23

24

25
```

1          (Begin proceedings in open court 10:27 a.m.)

2          THE COURT:  Good morning, everybody.

3          THE CLERK:  3:18-CV-151, B.L., et al., versus

4     Bradley Schuhmann, et al., for a status conference.

5          THE COURT:  All right.  Good morning.  So I don't

6     know how strong the smell is in this courtroom.  Do you-all

7     smell polyurethane?  No?  Okay.  Well, don't go out in the

8     back hallway then.  That door was open and I was afraid it had

9     wafted in here and I was half concerned that -- it's fine,

10    yeah.

11         I was half concerned I would come in here and find

12    half of you passed out on the floor.  They did -- I guess it's

13    Judge Jennings' chambers that are being renovated and I think

14    they put the top seal down on newly-stained hardwood floors

15    that apparently had been there hiding under carpet for many

16    decades, so it looks beautiful, smells awful.  So I'm glad

17    it's not bad in here.  I was really concerned about whether

18    we'd have to move downstairs or something.

19         Okay.  So let me ask you-all -- if I call on any

20    particular one of you, then you don't need to state your name

21    reflexively, but if I ask who can shed light on something,

22    please identify yourselves.  I know most of you but maybe not

23    a hundred percent of you and April, our court reporter,

24    probably doesn't have you-all memorized just yet, so if you

25    could just tell us who you are, we would appreciate it.

1          I have a list of who's here.  Theresa, do we have

2     this -- we can just have this for the record, right, we don't

3     have to have people go around and announce themselves?  You've

4     got this list and April has this list?

5          THE CLERK:  Yes, sir.

6          THE COURT:  Okay.  All right.  So I've got a

7     relatively short list of items I wanted to talk about today.

8     The first is the issue that we talked about last time -- at

9     least last time we were here together in person; the discovery

10    addressed to McNary & Associates.  And just to recap, the

11    approach was we were going to ask the plaintiff to work with

12    Louisville Metro and find out what you could get from

13    Louisville Metro before having to go to McNary to try to ease

14    the burden on the nonparty.  So with that reminder, Ms. Cordes

15    or Mr. Schneider, would one of you for the plaintiff tell me

16    kind of where that stands?

17         MR. SCHNEIDER:  Yes, sir.  Good morning.

18         THE COURT:  Good morning.

19         MR. SCHNEIDER:  Mr. Jeffrey Phillips at Steptoe &

20    Johnson and I have been working together on that.  And I

21    believe it was on Monday --

22         MR. PHILLIPS:  Tuesday.

23         MR. SCHNEIDER:  Tuesday?  And today's Thursday.

24    That on Tuesday his office produced I'd say roughly 1,200

25    pages of documents.

1     MR. PHILLIPS:  800.

2     MR. SCHNEIDER:  800?  Yeah.  800 pages of documents

3  responsive to the subpoena or that -- that kind of encompassed

4  items that were identified in the subpoena about McNary doing

5  work for youth prevention programs on behalf of Louisville

6  Metro including but not limited to the LMPD Protection

7  Programs.  And noticeably in those documents is some

8  correspondence and documentation with regard to LMPD's

9  production policies and programs which we believe to be

10 relevant to this case.

11     It's my understanding that Louisville does not have

12 any additional documents that it believes are going to be

13 responsive to that subpoena.  Based on the information that

14 was gathered, I emailed Mike Noll who's counsel for McNary and

15 I also spoke with him this morning.  Mike said he didn't get

16 my email, so I just re-sent it, but I explained to him we got

17 these documents.  I have reviewed them.  There are certain

18 items that Louisville does not have that I do believe that

19 McNary's office is going to have.

20     I will create a further refined and defined list and

21 get that to him by Monday and then he should be able to

22 discuss the further defined and refined list with his client

23 and determine if she even has any such documents, and if so,

24 how long it will take her to locate them and produce them.

25     But seeing as how she has information related to

LMPD's youth prevention policies -- and there was some
communication and looked like she -- her company did some work
on those.  I do believe that those documents are relevant in
this case and ought to be produced.

THE COURT:  All right.  So at the risk of stating
the obvious -- have a seat, Mr. Schneider.  At the risk of
stating the obvious, there's still some work to be done there.
And I'm kind of gesturing at Louisville Metro, but the work
may not be yours.  Mr. Noll, do you even want to shed some
light on this?

MR. NOLL:  We're fine with what Mr. Schneider said.
I just received the documents Tuesday evening.  I have
forwarded them to my client.  She's in the process of
reviewing them.  We'll review them, see if -- I guess we'll
need to get the refined list of what Mr. Schneider's still
seeking related to the Louisville Metro Police Department --
or Public Protection, whatever that -- his refined list.  And
it sounds like if it's going to be narrowed to that extent,
we'll see what she has and then work from there.

THE COURT:  Okay.  All right.  Well, listen, I am
the only one involved in this who hasn't seen any of the
documents, so I can't join in any -- either side's assessment
of whether the right documents have been produced or whether
there are more, but from a procedural standpoint I really
appreciate the way you-all are doing this.  You're doing

1    exactly what we talked about doing and working with each

2    other, not lobbing accusations at each other and so I

3    appreciate it.  Just keep working toward that goal.

4         If there is something that needs my intervention,

5    that's fine, but -- and I am happy to make a ruling if I need

6    to, but for any number of reasons including, you know, your

7    client's financial wellbeing, the less involved I am probably

8    the better, so keep working with each other.  I appreciate

9    that.  So any of the attorneys for Louisville Metro want to

10   add anything to that?

11        MR. PHILLIPS:  Your Honor, Jeff Phillips.  Nothing I

12   want to add other than just to clarify with Mr. Schneider that

13   I did send him an email outlining that there were two other

14   projects that McNary either made a bid on or had some

15   involvement with and Mr. Schneider -- that I have those

16   documents and have not produced those documents.  And I think

17   it's maybe 80 documents.  And Mr. Schneider said they're

18   unrelated to the youth protection policy issue, so don't worry

19   about it, but I don't have anything else to add.

20        THE COURT:  All right.  Thank you.  Mr. Schneider,

21   you in agreement on that last point?

22        MR. SCHNEIDER:  Yes, sir.

23        THE COURT:  Okay.  All right.  Thank you all.

24   Anything else on that issue -- on the McNary issue, anyone,

25   before we move on?  All right.  So you-all saw -- I assume

1    everyone has not only seen but has got the -- got to work on

2    doing what needs to be done with respect to the criminal

3    discovery.  And, Mr. Schneider, Ms. Cordes, is there

4    anything -- those deadlines haven't come yet, so I'm not

5    insisting on any sort of answer right now, but do you have any

6    light to shed on how that is going?

7             MS. CORDES:  Yes, Your Honor.  I don't know if this

8    is the proper court to ask or if we need to ask Judge

9    Jennings, but I think given that we now are going to receive

10   these criminal discovery documents by February 6th, we've

11   actually got an expert deadline in this case of February 20th,

12   2020, so it's going to be absolutely impossible for us to meet

13   that deadline.

14            So I emailed all defense counsel this morning and

15   suggested pushing all deadlines in this case out 120 days.  I

16   haven't heard from everyone, but I think the point is with the

17   deadlines as they are now, we are going to have to tweak them

18   and move them.  We've got many witnesses that are fact

19   witnesses that we're not even scheduled to take their

20   depositions until late March.

21            We recently had to reschedule the depositions of two

22   of the lead defendants, Mr. Wood and Mr. Betts, because of the

23   fact that we won't have the criminal discovery prior to their

24   depositions which we were going to try to take next week and

25   it looks like we're not even going to be able to take their

1    depositions now until April just because of the logistics and

2    issues with scheduling with the federal prisons.

3            So I'm happy to propose an amended scheduling order

4    and circulate it to counsel and see if we could work it out

5    that way or if the Court has any other directive as to the

6    scheduling guidelines, but just want to make the Court aware

7    it looks like we're not going to be able to meet them as of

8    now.

9            THE COURT:  Understood.  And that's actually --

10   other than just going around the horn and asking is there

11   anything else for today, that was going to be the last thing I

12   was going to cover today, but let's go ahead and talk about it

13   now.

14           This -- I had a situation -- it was minor.  It was

15   no big deal.  It at all got worked out.  It was a settlement

16   conference issue and I know that many of you here have been in

17   settlement conferences with me and we occasionally have

18   discussions about who needs to be here.

19           And there was a minor problem with attendance that

20   did not harm the process, but I had a conversation with a

21   lawyer about it and I thought the way he put it was great.  He

22   said, "This reminds me of something that one of my law

23   professors told me, 'Read to the period.'"  You know, read the

24   whole thing.

25           So one of the things I found is that, you know,

1    there is a surprising -- surprising to me degree of -- I

2    don't -- just different -- there are many different

3    approaches.  I was on a panel of -- at the Sixth Circuit

4    conference and we were trying to talk about a particular topic

5    and they wanted one magistrate judge from every district in

6    the circuit.  I think that's 11.  It's either 11 or 13.  We

7    couldn't agree on a thing.  I mean, we couldn't provide any

8    information to the attendees because we couldn't agree amongst

9    ourselves about how something was supposed to be done.

10   And then we had -- we did the same thing at the KBA

11   where we had two or three from the Western District, two or

12   three from the Eastern.  Same thing.  We imparted no useful

13   information because none of us could agree on -- you know, one

14   of the judges said, "Oh, if you don't understand something

15   about an order, just call me and we'll talk about it."  I

16   said, "No, no, no.  Don't call me.  Don't call me.  We won't

17   talk about it."

18   So anyway, my -- that's my long-winded setup to say,

19   you know, even in our jury division, let alone in our

20   district, we don't do everything the same way in every case,

21   and so one of the things that you may or may not have noticed

22   depending on whether you've read to the period is that I can't

23   move either your trial date or your Daubert date or your

24   motion for summary judgment date.  I can move the rest of

25   them, but of course if all I do is back everything up against

1   those, I haven't really helped you much.

2           So what I would suggest that you-all do is to first

3   of all agree to the extent you can on what exactly ought to be

4   done on all the -- all the deadlines; those I can move and

5   those that only Judge Jennings can move.  Make a comprehensive

6   list of that.  I think that's step number one.

7           Step number two, I mean, I'm happy to address moving

8   those that I can move, but again I don't know that that does

9   you a whole lot of good, so I think a better step two is to

10  file a joint motion.  And I'm kind of crossing my fingers when

11  I say a joint motion.  I hope that you-all can agree.  Sounds

12  like these are logistical problems as opposed to some

13  fundamental disagreement about how to approach the case.

14          So file a joint motion.  The -- there is a function

15  of the clerk's office that I had no idea of until I started

16  doing this job.  I didn't know if you had to file a motion

17  with the particular judge or exactly how that worked.  Well,

18  some of that -- some magic switches get flipped down in the

19  clerk's office.  They know with what type of motion and which

20  judge -- judges are assigned to the case, who that motion

21  should be submitted to.

22          So file the joint motion.  You don't need to craft

23  it so that it's to Judge Jennings.  Just file a joint motion.

24  The clerk's office will submit that.  If it is one joint

25  motion and includes MSJ trial date, those things, in addition

1    to discovery and other things, it will be submitted to Judge

2    Jennings.  She'll take care of that.

3           If you wanted for whatever reason to do it in two

4    separate motions, let me go ahead and give you some relief on

5    the discovery front, I can do that, but I think just doing it

6    all in one joint motion is probably the most efficient for

7    everybody -- really more efficient for you-all.  So are there

8    any questions about that and how to approach that?

9           Okay.  So coming back to the criminal discovery

10   issue that kicked off that discussion.  Is there anything --

11   are there any issues?  Are there any problems or -- or are

12   you-all working forward, Ms. Cordes?

13          MS. CORDES:  Your Honor, I believe we've essentially

14   hashed all that out and we're waiting for those documents to

15   be produced.  My understanding is that defense counsel has

16   just recently received those and is now going through and

17   doing the redactions.  I think Mr. Brammell may have a

18   question or a request for some clarification regarding some

19   audio interviews that they received of other victims and how

20   to approach redacting those, so I don't know if you want to

21   ask the Court for guidance.

22          MR. BRAMMELL:  Yes, Your Honor.

23          THE COURT:  Mr. Brammell?

24          MR. BRAMMELL:  We're in the process -- and I don't

25   know.  It might be moot.  We have received a number of audio

1　files and we're in the process of indexing them to determine

2　what kind of redactions need to take place.  I think the only

3　question we had and we can try to work through is there are a

4　number of audio files.

5　　　　I think most of them have actually already been

6　produced in the litigation before, so it's probably a moot

7　point, but to the extent that any of the audio files haven't

8　been produced and contain information about those -- those who

9　are not plaintiffs in this case, we just had a question about

10　how we should go about redacting the audio files.

11　　　　THE COURT:  Well, I'm probably the last person in

12　this room that you want to get, you know, any technical advice

13　from.  I don't know if this is going to help you much, but my

14　gut reaction to that is treat it as if it were a transcript of

15　the audio file.

16　　　　If -- do you feel that I gave you -- ideally I would

17　have my previous order up in front of me.  I had some

18　technical issues this morning with my electronic device, so I

19　don't have it in front of me, but do you feel that I gave you

20　enough guidance in the order so that you can apply that to an

21　audio file or is there some greater clarification that's

22　necessary?

23　　　　MR. BRAMMELL:  I think what we would do -- and I

24　think this would be in accordance with the order -- is

25　probably just try to beep out the names.  I think your

1    order -- it just said to redact personal identifiable

2    information, so I think that would be our intent is just to

3    beep out the names whenever they're said throughout the

4    interview.

5            Of course that does mean -- and, again, we're

6    indexing the files, so I'm not quite sure what the volume is,

7    but it means we have to listen to all the audio files to beep

8    out the names in advance, but we're working hard to get that

9    done and believe we'll be able to do it by the beginning of

10   February, and if not -- if that date proves to be impossible,

11   we'll reach out to plaintiffs and try to come to an agreement

12   or approach the Court, but we're working diligently

13   particularly now that we don't have depositions next week to

14   get those redactions.

15           THE COURT:  Okay.  Well, listen, I want to be

16   rational about that.  You know, I gave you what I thought was

17   long enough but not more than long enough just because I want

18   to keep things moving and I don't want to assume that Judge

19   Jennings is going to move any of the other deadlines, but I

20   hear you.  It's obviously going to take longer.

21           You know, if you've got an hour-long audio file,

22   it's going to take you an hour to listen to it, at least.

23   You're probably going to have to stop it a bunch of times.

24   It's not like you can skim through it, so that might be three

25   hours of work that if it was on paper would take you 15

1    minutes, so I understand that and I'll try to be flexible.

2          The only tweak I would add to that -- you may in

3    fact have meant this. Even if you-all can agree on changing

4    those deadlines, go ahead and submit a request -- either

5    submit a motion -- file a motion or otherwise, you know --

6    well, that's -- it's going to be the best thing to do is just

7    to file a motion --

8          MR. BRAMMELL: Absolutely.

9          THE COURT: -- in that regard. And I'm not picking

10    on anyone who came in late, but I just want to make sure that

11    we have everybody down. Could the two of you -- are you-all

12    here on the Explorer cases?

13          UNIDENTIFIED MALE SPEAKER: No, Your Honor. We're

14    just spectators.

15          THE COURT: Oh, okay.

16          UNIDENTIFIED MALE SPEAKER: A lot of brainpower

17    here. Just checking it out.

18          THE COURT: Yes, absolutely. You guys draw a crowd.

19    Congratulations. Okay. All right. And Mr. Noll was not

20    highlighted, but there he is right there, so if you could add

21    that Mr. Noll is here on behalf of McNary & Associates.

22          MR. PALMER: Just a comment on behalf of Defendant

23    Wood.

24          THE COURT: Yes?

25          MR. PALMER: Obviously we're in a highly similar

1  boat --

2         THE COURT: Mr. Palmer, correct?

3         MR. PALMER: Mr. Palmer, sorry. We're obviously in

4  a similar boat to Mr. Brammell. We're just getting our head

5  around what we have and our arms around what we have and then

6  applying our head in terms of the redaction strategy to

7  everything, but I believe that a conversation I had with

8  Ms. Cordes last week I, you know, expressed a desire to

9  reserve our ability to seek more time if we need it and any

10  further clarification on what redaction may entail if we can't

11  come to an agreement, but by in large I think everything that

12  Mr. Brammell expressed applies to us as well.

13         THE COURT: All right. Understood. Just let us

14  know if -- if we need to tweak anything there. Okay. Anyone

15  else have anything on the criminal discovery issue? All

16  right. So the other thing I was going to ask, but really

17  we've -- we went ahead and kind of forwarded to it is just how

18  are we doing against the deadlines.

19         And so what I think I've heard so far is that a lot

20  of work has been done, a lot of progress has been made. I'm

21  not hearing anything that makes me even suspect that anybody's

22  being dilatory, but there is more work to be done. There's

23  some digesting of what you've already received. There are

24  more documents to be produced.

25         Do the depositions of the two folks in custody need

1    to be -- have they been rescheduled or do they still remain to

2    be rescheduled after some of these other things happen?

3         MS. CORDES:  Your Honor, they remain to be

4    rescheduled.  And thankfully we had all reserved dates in

5    April for this exact reason if we needed to reschedule, so I

6    don't think it should be that big of an issue.  And we've also

7    figured out the logistics of how to go about taking them in

8    each respective prison, so I'm going to actually circulate an

9    email after today's hearing and we'll try to get that date

10   nailed down hopefully early next week with everyone.

11        THE COURT:  Okay.  So, listen, I'm going to talk out

12   of both sides of my mouth on this issue, all right?  I know

13   that it's no easy task to schedule anything with this number

14   of people and add to that the complexity of taking a

15   deposition in custody -- two depositions in custody in two

16   different places.  I get it.

17        But I'm going to ask you-all to do everything you

18   can to understand that as well and anticipate that and not let

19   it turn into what it could turn into which is just, you know,

20   months and months of emails about dates with no real progress.

21        So I feel like you're doing that -- doing the --

22   when I say "doing that," I mean you're working proactively,

23   you're working well with each other.  I have every indication

24   that that's what you're already doing, so please don't take

25   this as a scold; just as a reminder to keep the pedal down as

1    much as you can.

2          This is just inherently complex enough and seven --

3    you know, six or seven -- I always think the magic number is

4    seven, but I'm -- oh, okay.  There's the seventh case number

5    up there.  Yeah.  Okay.  So seven trials.  You know, we've

6    got -- we have plenty of work ahead of us.

7          All right.  So the -- is there anything else about

8    the schedule that we haven't already covered that anyone would

9    like to raise at this point?  All right.  So my favorite topic

10    in every case -- I can't remember if I raised it last time.

11    I'd be somewhat surprised if I didn't.

12          I don't need or want anyone to make any highly

13    specific comment about this at this point, but I do want to

14    remind everybody that approximately 99 percent of our civil

15    cases settle, and so -- not every case does settle or can, not

16    every case needs a settlement conference as opposed to a

17    mediation or some discussions, just lawyer to lawyer.

18          That being said, the settlement conference is the

19    most common tool used to settle cases.  I guess the question I

20    will -- the only question I'll ask now is as it relates to

21    timing.  Do the parties think that -- that either now is the

22    right time to schedule a conference understanding that to

23    schedule it -- just in the average case, the settlement

24    conference itself would likely be in, you know, April or

25    thereabouts -- maybe March but probably April or thereabouts.

1    Given the number of lawyers involved, number of

2   parties and party representatives, that may well -- you-all

3   may not be able -- I could start giving you dates in late

4   March, early April.  So is now the right time to talk about

5   scheduling or are there other landmarks that you want to hit?

6    The one thing that I would caution that many of you

7   have heard me say before, there isn't any one time that is the

8   right time to talk about settlement in a case.  Sometimes the

9   end of fact discovery makes sense, sometimes after the MSJs

10  have been filed but not ruled on works, although that's

11  overall kind of my least favorite time.

12    There isn't any one time that is the right time, but

13  I do believe it is very important to -- I'm not a big fan of

14  the word "proactive" and I'm about to use it for the second

15  time.  It's always the right time to think about it and talk

16  about it, all right?  So, again, limiting it to just timing,

17  is now a good time?  Is two months a good time?  Is the end of

18  discovery a good time?  Ms. Cordes or Mr. Schneider, your

19  thoughts on this?

20    MS. CORDES:  Your Honor, I think at this point based

21  on some conversations that we have had with counsel, it

22  probably would not be the best time at this point to schedule

23  that for March or April.  I don't think we'd be really in a

24  different position.  I would think after our expert

25  disclosures or even after defense expert disclosures.  That

1    might be a better time to readdress that subject.

2           THE COURT:  All right.  And I don't want to assume

3    that there is unanimity on this point, but let me just ask.

4    Are there any defendants who want to comment on that or any

5    defendant -- counsel for any defendant who want to propose or

6    suggest a different sort of timing to settlement?  I'm seeing

7    a highly amused but nonetheless inscrutable look on

8    Mr. Murphy's face.  I'm not sure what this means.

9           MR. MURPHY:  I want to note for the record that I

10   was literally the furthest lawyer away from you and I did that

11   on purpose and you still saw fit to call on me, Your Honor.

12          Speaking of course only on behalf of our clients --

13   this is Marc Murphy and I represent Boy Scouts and the

14   Learning For Life defendants.  We have no reason at this point

15   in time to disagree with what Ms. Cordes said on behalf of the

16   plaintiffs.

17          I think everything you've said about us working

18   together appropriately and vigorously representing our

19   respective interests is true.  And we've got a couple of

20   solid -- actually two and a half months of depositions

21   scheduled it seems like nearly every day and we've been able

22   to put that together with our various schedules.

23          I think that at a minimum I can say on behalf of our

24   clients, possibly for the others, that it's too early to

25   schedule something right now.

1    THE COURT: Okay. All right. Anyone have any

2  differing thoughts on that in terms of timing, Mr. Sitlinger?

3    MR. SITLINGER: Lee Sitlinger. I represent Curtis

4  Flaherty. I respectfully disagree. We've taken depositions

5  of six of the plaintiffs. We have one more that we couldn't

6  take that's rescheduled. We can overcomplicate this case all

7  we want, but the basics of the case I think I feel comfortable

8  that I have sufficient information to evaluate the case.

9    However, plaintiffs -- I have no money to offer. I

10  do not represent a client that's going to monetarily

11  contribute to any settlement, so my voice makes very little

12  difference in this case, but if the plaintiffs and the

13  defendants with money are not interested in settlement at this

14  time, that's -- nothing I can do about that, but from my

15  perspective from just being a trial lawyer, this case could be

16  discussed for resolution.

17    THE COURT: All right. Thank you. And, you know,

18  much as I -- very similar to what I said about the timing.

19  There's no one time that's right. You know, there's no one

20  approach that's right and -- on the spectrum of -- in some

21  cases I get a clear unambiguous signal from both parties "We

22  want to talk about settlement" and then on the other end of

23  the spectrum, we got one plaintiff and one defendant who both

24  say there's no way this case can settle and then there's

25  everything in between.

1        And when -- when do I cross that line on the -- you

2    know, reminds me of the -- you know, the predictable old adage

3    about leading -- you can lead a horse to water but you can't

4    make it drink.  You know, where on that spectrum am I kind of

5    strong-arming people into the room?

6        Sometimes people need a little help getting into the

7    room, but if you give them too much help getting them into the

8    room, then you've just set yourself up for failure, so it's

9    a -- it's not the easiest thing to figure out, but

10   Mr. Sitlinger, I appreciate your comments and your attitude

11   about it, but also, you know, Ms. Cordes, Mr. Murphy, I

12   understand also wanting to know more, so --

13       All right.  Again, I'm not trying to pick on

14   anybody.  Just for completeness of the record, we have

15   Mr. Fuller who's joined us, is that correct, or am I miss --

16   yes?

17       MR. GADANSKY:  No.  Judge, Chris Gadansky.  I'm here

18   for the Smith --

19       THE COURT:  Oh, I'm sorry.  Yeah.  You threw me off.

20   My apologies.  Okay.  And now I can't remember what Mr. Fuller

21   looks like.  I'm going to be embarrassed when I see him.

22       Okay.  All right.  So let's leave it at this when it

23   comes to settlement.  Two things.  I guess it's really three

24   things.  First of all, keep it in mind and keep an open

25   channel of communication on it.

1       There's lots of experience in this room and even for

2    those of you who haven't necessarily been practicing that

3    long, I've had some experience with you-all and I know that

4    you've got good sensible, solid approaches to how you practice

5    law, so I don't suspect that you-all will be unnecessarily shy

6    about talking about settlement, but it's just one of those

7    things as a litigator it's sometimes the hardest thing to

8    bring up or you don't want to be the person who brings it up.

9       You want to talk settlement just as much as the

10   other person does, but you don't want to be the one to broach

11   the topic.  Just broach it.  I'll broach it for you.  So let's

12   talk about settlement and talk about it early and often.

13       Whenever there is a momentum towards wanting to get

14   together, there doesn't need to be unanimity, there certainly

15   doesn't need to be any sort of, you know, real confidence that

16   the case can be settled.  When there is momentum toward

17   wanting to try, then let's do it, all right?  It will be two

18   or three months out anyway and you can keep working and

19   learning, you know, as you approach those dates, so sooner

20   better than later, I guess, is my point.

21       Secondly, when you -- when any one of you even gets

22   to the point where you want to propose settlement even if

23   there isn't agreement -- even if there isn't momentum, you

24   can -- on this topic I do encourage direct communication to

25   chambers.  You can send an email to the chambers account and

1    copy opposing counsel and say "I think" or "I and the

2    following six parties think that we ought to have a settlement

3    conference," all right?  It's fine to file a motion, but it --

4    you don't need to file a motion, all right?

5           And the last thing I will say for now about

6    settlement is an important part of the process can be, you

7    know, ex parte calls.  And I'm looking around.  I see four or

8    five people I know that I've had ex parte calls with on

9    settlement.  It's the one topic that is not only fully

10   appropriate to talk ex parte about, it's a part of the

11   process.

12          When we're sitting in our jury deliberation rooms

13   down at the end of the hall and I walk into your-all's -- you

14   know, into Louisville Metro room or Brandon Wood's room or the

15   plaintiff's room and close the door, guess what we're having?

16   An ex parte conversation.

17          So we can do that by phone, we can do it ahead of

18   time, all right?  So that can help sometimes kind of bridge a

19   little bit of a gap, not necessarily -- I don't mean a

20   financial gap, but just closing the gap on understanding

21   whether we should have a settlement conference yet, all right?

22          So feel free to -- that the request should be out in

23   the open.  Send an email to the chambers account or to

24   Theresa's email account, copy everybody else and say that

25   you'd like to have an ex parte phone call about settlement.  I

1  will enter a text order that says "I'm going to have ex parte"

2  or "I may have ex parte conversations with lawyers about

3  settlement," all right?  So just bear that in mind that that's

4  a tool that you-all have.

5           So that is the end of my list, but I'm happy to talk

6  about anything else that is on your-all's mind.

7  Mr. Schneider, Ms. Cordes, do you-all have anything else to

8  bring up today?

9           MR. SCHNEIDER:  We do, Your Honor.  And Jeff and I

10  have discussed this -- Jeff Phillips, Steptoe & Johnson,

11  represents Metro and has recently entered an appearance I

12  think back in November or December.  Pretty recently.

13           MR. PHILLIPS:  December.

14           MR. SCHNEIDER:  His office and my office have had

15  extensive phone and email correspondence about certain

16  discovery matters.  And also I guess there's kind of like four

17  things that we may want to discuss with the Court today on

18  that.  Some of them are brief and some of them are not so

19  brief, so if the Court would hear us, we would like to kind of

20  flesh a few things out.

21           THE COURT:  Yeah.  I vote for trying to do as much

22  as we can.  Let me just hit the pause button for one minute.

23           (Discussion off the record.)

24           THE COURT:  All right.  Thank you-all.  So let's go

25  back then to the issues that Mr. Schneider was just about to

1    raise on discovery.  I do have an 11:00 o'clock, and so I

2    will -- I keep half joking.  Every now and then our IT

3    department says what -- you know, what is your -- what's your

4    dream world for -- you know, what capabilities can we give you

5    from an IT standpoint that you would love to have.

6         And I keep saying half jokingly I need a program

7    that tells me what to do next so I minimize the number of

8    people waiting -- or the total number of hours, so given the

9    number of you-all, I'm going to try to finish this, all right,

10   and get the maximum number of people done and out of here, but

11   I might slip in this 11:00 o'clock because I think it will

12   take six minutes, but just bear with me on that.

13        All right.  So, Mr. Schneider, let's go through

14   those four issues.  And if you would, come up and use the

15   podium, not for formality sake, but I'm having a little

16   trouble hearing you, and so that way if you could just make

17   sure you use that microphone.  And I'm not one of those people

18   that accuses everybody else of being a low talker.  I've got

19   hearing loss, and so it will help me if you use that

20   microphone.

21        MR. SCHNEIDER:  No problem, sir.  And, again,

22   Mr. Phillips and I have worked very cooperatively on this and

23   it's -- the process has been going well.  He has raised some

24   issues that have come up with regard to the first item and we

25   had sent a subpoena to Dickinson Wright as well as the

1    attorneys that were hired at that law firm.  They were hired

2    by Louisville to do an investigation into some of the facts

3    and circumstances surrounding this case, you know, back when

4    it happened.

5              Louisville had agreed basically to have

6    Mr. Phillips' office gather those documents that were

7    responsive to the subpoena from Dickinson Wright, review them

8    and produce them and prepare an appropriate privilege log and

9    it's my understanding that he's done that.  It's my

10   understanding that he's got several thousand pages of

11   documents and it's also my understanding that he has a

12   privilege log.

13             But -- and I'll allow Mr. Phillips to address this

14   issue.  During his review of those materials, an issue of

15   Federal Criminal Rule 6(e) arose and it's my understanding

16   that he is concerned that may run afoul of Federal Rule of

17   Criminal Procedure 6(e) and for that reason those materials

18   have not yet been produced to my office.  And I would -- I

19   think we are both seeking guidance on that issue as to whether

20   or not there is any prohibition from production in this case.

21             THE COURT:  All right.  Thank you.  Mr. Phillips?

22             MR. PHILLIPS:  Yes, Your Honor.  Jeff Phillips for

23   Louisville Metro.  Mr. Schneider is correct.  There was a

24   subpoena that went to Dickinson Wright and the Court allowed

25   me as counsel for the client, Louisville Metro, that hired

Dickinson Wright to do this internal investigation to review
the materials.

I've communicated with Dickinson Wright personnel
and was led to believe that the United States Attorney's
Office has taken a pretty broad interpretation of the Rule
6(e) grand jury implications of materials that may be part of
the Dickinson Wright investigatory materials.

So I've reviewed those materials. I called and I
spoke with -- spoke with Assistant United States Attorney Jo
Lawless on January 6th to get a feel from her about, you know,
does the U.S. Attorney's Office think that Rule 6(e) is
implicated by the materials that I have.

She relayed to me that the investigation -- the
criminal investigation is still ongoing, that it's not
completed, that she believed it neared completion but it was
not done. When I said, you know, well, what might be
considered the Rule 6(e) materials, I did not feel like I got
a clear directive from the U.S. Attorney's Office about what
would be appropriate for me to disseminate and what not.

I said, "Well, what about materials that were
collected or generated before the FBI had started its
investigation or before a federal grand jury was impaneled?"
I just felt like I did not get a clear directive on how the
U.S. Attorney's Office came down on that. I advised
Ms. Lawless that I was going to speak with Mr. Schneider about

1   this, that I anticipated that this issue would likely arise

2   during the January 16th status conference that we had before

3   you.  I said, you know, you're certainly invited to have

4   someone come here if the U.S. Attorney's Office wants to

5   commit to a position at the status conference.  I don't know

6   how the magistrate judge would handle this.

7          And so one of the times when Mr. Schneider and I

8   spoke yesterday, I think I had told him that I was going to

9   call Ms. Lawless again and let her know about today's status

10  conference.  I got a voice mail message.  I believe she may be

11  in trial, so I'm not surprised that no one's here.

12         But this issue to me is probably going to permeate

13  over all four of the issues that Mr. Schneider wants to talk

14  about because it is information that Louisville Metro is

15  collecting, that Louisville Metro is analyzing, determining

16  what's responsive, what's not, what's privileged, what's not,

17  but then we've got this Rule 6(e) concern that's hanging over

18  us, but first and foremost, it's on this issue with the

19  Dickinson Wright subpoenaed materials.

20         So Mr. Schneider is correct, I have gone through

21  those materials.  It's over 5,000 documents.  Redactions have

22  been made.  A privilege log has been made.  I just am not --

23  Your Honor, I don't believe I'm in a position to disclose that

24  to the parties unless I get the green light from the U.S.

25  Attorney's Office or you tell me it's okay to disseminate that

1    information, so that's -- that's where we are.  And like I

2    said, I think this is also going to permeate the next three

3    issues that Mr. Schneider wishes to discuss.

4         THE COURT:  Okay.  Well, I -- first of all, you're

5    right about Ms. Lawless.  I happen to know because of some

6    other scheduling things that she is in trial with Judge

7    Stivers in Bowling Green, so there is that.

8         I'm not saying or suggesting that the United States

9    Attorney's Office doesn't have a say in this, but I haven't

10   heard yet why anybody thinks they do have a say in it.  If --

11   I mean, are these -- these -- are these materials materials

12   that were submitted to the grand jury?

13        I mean, I thought I was getting the impression that

14   Dickinson Wright -- Louisville Metro hired Dickinson Wright to

15   do some work and they did some work and these documents are

16   the fruits of that work.  Is that all correct so far?

17        MR. PHILLIPS:  That's correct, Your Honor.  What I

18   believe, though, is some of the materials that Dickinson

19   Wright collected as part of their investigation had already

20   been generated and it's -- I don't believe that any of the

21   materials Dickinson Wright created itself went to the federal

22   grand jury, but information that Dickinson Wright collected

23   that already existed, I don't know the answer, but I believe

24   some of those materials were in fact provided to the federal

25   grand jury and were used in whatever decisions they've made

1    with regard to Mr. Wood and Mr. Betts and may be being used on

2    whatever else the U.S. Attorney's Office is doing.  I just

3    don't know specifically the answer to the question that you're

4    asking me.

5         THE COURT:  Okay.  Well, I think -- I don't want to

6    go off half-cocked.  I don't want to just sit here and, you

7    know, let you-all watch me read a rule and see if I interpret

8    it correctly.  I think there is really the threshold -- my

9    threshold question is just who has a say in this and who

10   doesn't.

11        And, you know, when you ask someone whether it's

12   okay -- whoever it is.  You ask someone if it's okay to do

13   something, then you have implied to that person that they have

14   a say over whether you do something or not, and so -- and I'm

15   not faulting anyone for doing it, so -- and I don't even know

16   what the United States Attorney's Office's thinking is.  They

17   may well say "This is not up to us."  These are not

18   materials -- no one's subpoenaed the grand jury documents, for

19   example.

20        So I think the trick then is going to be to figure

21   out how to address this.  It may be enough for me to just take

22   it under advisement, to look at the rule and give it some

23   thought.  It may be better -- I hate to, you know, multiply

24   work for you-all -- you're doing so much already -- to give

25   you even more to do.  It might be helpful to have a better

1  understanding of what the Dickinson Wright documents are and

2  how they relate to the grand jury.

3         Did Dickinson Wright create a document that later

4  went to the grand jury?  Did they get a document from the

5  grand jury?  If I could have maybe a more precise description

6  to the extent you can provide one without running afoul of the

7  concern that you have, I think that would help me in deciding

8  whether there is any protection that is due to these

9  documents.

10        MR. PHILLIPS:  In that regard, Your Honor, would you

11  want Louisville Metro to secure an affidavit from a Dickinson

12  Wright person outlining that or do you just want a

13  representation from us that we've conferred with Dickinson

14  Wright and this is what we understand?

15        THE COURT:  Yeah.  I don't think I have any

16  particular need for an affidavit.  If that is a convenient

17  form, that's fine, but a representation -- you know, something

18  signed by counsel is going to be sufficient for me.  And I

19  hope I made myself clear.  Just to understand what really is

20  the overlap or the connection between the work that Dickinson

21  Wright did and materials that might be considered -- and this

22  is an imprecise phrase -- grand jury materials.

23        This is nothing but my initial reaction, but what I

24  suspect is going to be right is that if Dickinson Wright did

25  this work on behalf of Louisville Metro and created it and it

1  might be work product or whatever else, but, you know, if

2  you-all can agree to produce it in this case, then the fact

3  that some of those documents later made their way to the grand

4  jury or some of the documents cover some of the same

5  information, I don't suspect that that's going to be enough to

6  implicate a rule which, again, I'm trying to avoid being too

7  definitive at this point and/or to be too heavily semantic,

8  but, you know, a rule that arguably doesn't apply at all

9  because we're not in a criminal proceeding.

10  So if you-all -- and I don't -- I don't think I need

11  a motion and a response and a reply.  I think I just need some

12  more information.  Could you-all -- meaning Louisville Metro

13  and the plaintiff -- develop a joint submission on this or,

14  Mr. Phillips, is that going to raise any kind of privacy

15  concerns with you?

16  MR. PHILLIPS:  I think we could work on something.

17  I mean, I may be careful on how much I relay, but I think

18  Mr. Schneider and I can work on broad elements of it; points

19  of it.  I think we could put something together.

20  THE COURT:  All right.  What's a sensible period of

21  time for that?

22  MR. PHILLIPS:  Ten days.

23  THE COURT:  That seems quite prompt.  So if you-all

24  can work with ten days, that's fine.  And do you see this as

25  something that -- I think what I would -- would like is a

1    joint status report or, you know, something that would

2    actually be filed.  Is this something -- do you think you can

3    tell me enough in something that you can -- that you would

4    also be comfortable filing?  I -- I don't know you well enough

5    to read the look that you're -- the look on your face, but I

6    see some concern, I think.

7            MR. PHILLIPS:  Yeah.  I don't know that I -- my

8    knee-jerk reaction is that's a little worrisome to me.  I'm

9    afraid what I might submit to you in a written filed format

10   may be too sanitized or vanilla for you to really get to the

11   nub of what you want to get to.  I can try.

12           THE COURT:  Let me ask this:  Would either of you at

13   the podium or anyone else have any objection to a submittal --

14   even though it will not be a submittal of the documents

15   themselves.  It would be a submittal of a description of the

16   documents; to submit that for an in camera review as an

17   initial step in determining discoverability of it?  Does

18   anyone see any issues with doing it that way?  Mr. Schneider?

19           MR. SCHNEIDER:  Plaintiff's counsel does not, sir.

20   No issues.

21           THE COURT:  All right.  Mr. Phillips?

22           MR. PHILLIPS:  None at all, Your Honor.  We're happy

23   to do that.

24           THE COURT:  Any of the other parties have any issues

25   with that?  Okay.  All right.  So why don't you, if you would,

1  give me what the other -- Mr. Schneider, give me the other

2  three categories and tell me whether you agree with

3  Mr. Phillips that it all sort of nests under the same issue.

4       MR. SCHNEIDER:  Yeah.  The one that nests close --

5  very closely with that is as part of the investigation and,

6  you know, some of the issue that were brought up in the

7  criminal case and just kind of the investigation, what was

8  going on by Metro, they obtained images of cellular phones.

9       And it's my understanding at least with regard to

10  Betts and Wood -- maybe others.  That's just my understanding.

11  I don't know 'cause I'm on the outside looking in.  But it's

12  my understanding that they obtained cell phone images.  And

13  one of the subpoenas that we sent out back in either late

14  November or -- yeah, it was late November -- was to the

15  Regional Computer Forensic Laboratory asking them for images

16  and/or any reports created from those images from a long list

17  of people that are either defendants in this case or witnesses

18  in this case.

19       And we got a response from the -- from the RCFL.  We

20  got a phone call and that said, you know, "Please withdraw

21  your subpoena.  We're going to object to it.  You can obtain

22  those images elsewhere."  So I asked Louisville, "Did you

23  guys" -- "did your investigators, did your police, did --

24  whoever was looking at this back when it was being looked into

25  pull images?"

1          Because it's my understanding from the information

2   that the Regional Forensic Computer Laboratory representative

3   provided us that they don't store the images at the RCFL.  In

4   other words, the data that they suck off of and create like a

5   ghost image or whatever they use to run their analysis on it,

6   that image and the original device are returned to the

7   requesting agency.

8          So if, like, the Attorney General's Office request

9   it or the Metro Police request it, you know, they send a

10  device off, the copy's made, and both the copy and the

11  original phone go back to Louisville.  I don't know what

12  Louisville has because, you know, they're -- they're not my

13  client.

14         I've requested from Mr. Phillips to kind of drill

15  down into that after he came on board because I requested from

16  Ms. Taylor who is Louisville's counsel, "Do you guys have

17  these images?"  I've never gotten kind of a full response to

18  that with the exception of "We're looking into that."  And

19  then Ms. Taylor represented to me today just right before this

20  hearing and Mr. Phillips represented this to me I think on a

21  phone call maybe yesterday that the -- there is a PIU

22  investigator -- some sort of investigative unit officer with

23  the City of Louisville who may have information about that but

24  is not able or -- able to provide that information because of

25  the concerns under Rule 6(e) --

1          THE COURT:  Okay.

2          MR. SCHNEIDER:  -- so that's where 6(e) plays into

3     that one.  In other words, Louisville may have or may have had

4     or may continue to have or may know about images of certain

5     defendants or certain parties or certain witness's cell phones

6     that were taken in this investigation that are related to the

7     civil case because a lot of the communications between the

8     victims and, you know, others and the victims and the abusers

9     were done with cell phones, emails, text messages, pictures

10    sent and things like that.

11          And a lot of that information likely is going to be

12    stored on the images of the cell phones that were -- were or

13    should have been obtained and kept by Louisville if that

14    exists, but I don't know enough about it because they haven't

15    been able to provide my office with enough information about

16    it for me to appropriately articulate it to the Court exactly

17    what exists, so with that I'll pass to Mr. Phillips on that

18    issue.

19          THE COURT:  Okay.  Mr. Phillips?

20          MR. PHILLIPS:  And Mr. Schneider not having enough

21    information, it's probably because we don't have enough

22    information to answer that, otherwise we would have passed it

23    along to him.  We are trying to find out exactly which phones

24    were taken, when were they taken, did they ever return, did

25    the images just return, where did they go?

1          We don't have the answer -- answers to that

2     information yet.  What I understand -- and if I'm inaccurate,

3     I'll ask Ms. Taylor to correct me, but from what I understand

4     the attempts that we have made to track down the cell phones

5     or the cell images, the first point to go to would be a PIU

6     investigator which would have purportedly been involved in

7     that process; getting that -- the cell phones to the lab.  And

8     were running into from the PIU unit investigator, "I can't

9     disseminate any of that information to you unless I get the

10    green light from the U.S. Attorney's Office that I'm allowed

11    to tell you what phones went, if they came back, what

12    information we got back."  So we're still trying to work

13    through that, but that's where we are at this point, Your

14    Honor.

15          THE COURT:  I think that -- Mr. Brammell, did you

16    have anything on this?

17          MR. BRAMMELL:  This is probably a secondary point,

18    but I would like to just notify the Court, we had filed a

19    motion to quash originally when that subpoena was issued

20    because we were concerned about overbreadth.  Frankly it was

21    the entire image of my client's phone in addition to other

22    phones.

23          I don't know what was on his phone when the image

24    was taken, but I imagine there was marital communication which

25    would be privileged, potentially attorney-client privileged

1    information, so we had originally objected just to the

2    subpoena on the ground that it was overly broad.  It wasn't

3    narrowly tailored.

4         I think we'd still have those continuing objections

5    going forward.  I'm not sure the proper avenue to object at

6    this point, but I just wanted to alert the Court.  It's

7    probably a secondary issue, but we do have a concern about an

8    entire copy without more specific narrowly-tailored requests.

9         THE COURT:  Understood.  And, again, not to be

10    overly definitive at this point, but that -- that very same

11    thought popped into my head really as soon as I heard, you

12    know, "mirror image."  You know, every Yelp search and every,

13    you know -- like literally everything that's ever been done on

14    that phone is going to be in there, so there's almost

15    certainly going to be a lot of irrelevant information in

16    addition to what might actually be privileged, so I would hope

17    and assume that you-all would handle that in the ordinary

18    course.

19         And, you know, Mr. Schneider, you wouldn't insist on

20    knowing what Officer Betts, you know, taste in Thai food was

21    based on how many stars he gave a restaurant on Yelp because

22    that's going to be on his phone along with the text messages

23    that you actually care about, so just work through that.

24         I think -- and I'm happy to have comment from

25    you-all if you disagree.  I think that when you give me -- in

1      addition to doing some research that we're going to do, I

2      think that I can answer -- I'll be able to give you some

3      guidance on this after I see what you're going to submit.

4              I don't know that you need -- in fact, I'm sure I

5      don't need either a separate submittal or, you know, a

6      separate chapter on the phones.  You know, the broader issue

7      is who gets to say what about materials, so if you would just

8      include -- if nothing else as a reminder when you submit what

9      you're going to submit to me on the subpoena to Dickinson

10     Wright on that issue just -- just literally a couple of

11     sentences that "We've also" -- "We are also seeking any

12     relevant discoverable information on the mirror images of cell

13     phones to the extent that they can be located.  The defendant

14     has -- Louisville Metro has the same concern that it does on

15     the other issue."  All right.  Mr. Schneider, the next issue?

16              MR. SCHNEIDER:  Well, the next issue just kind of

17     falls in line behind that is that Louisville is still in the

18     process of obtaining and gathering responsive documents to

19     discovery requests that were sent a while ago.  They produced

20     some documents and then basically said "We're still in the

21     process of reviewing and producing."  And since Mr. Phillips'

22     office has gotten in, they've been able to move it over to an

23     electronic system that they're working through and producing

24     that and it's still my understanding that they have issues or

25     concerns about potential Rule 6(e) material in those as well

1  and that is not an insignificant number of documents from my

2  understanding.

3          He said he believed it was about 20 -- over 20

4  banker boxes full of paper documents as well as additional

5  emails and email accounts that are being searched and should

6  be part of a production and we can address that in that same

7  submission.

8          THE COURT:  Okay.  So that's basically internal

9  discovery.  There is no Dickinson Wright or whoever.  It's

10  just what is in your file?

11          MR. PHILLIPS:  Louisville Metro's file --

12          THE COURT:  Metro's file.

13          MR. PHILLIPS:  -- both the electronic files as well

14  as the hard -- the copies.  And that's -- Anne Frye from our

15  office is with me here today and she's spearheading the

16  computer program relativity that we use, Anne, and she's got

17  two of her colleagues working with her getting those hard

18  documents inputted and in a format that we can search them so

19  that production is going to speed up and there's thousands and

20  thousands of those that are being inputted and being searched,

21  so we are working in that regard.

22          Ms. Frye's here to answer if there are any

23  particular questions about, you know, how that process looks,

24  but we are endeavoring to move forward with that, Your Honor.

25          THE COURT:  Yeah.  I don't think I have any

1    questions about it so long as -- and I know I'm sounding like

2    a broken record.  You-all are -- you're doing exactly what I

3    would -- if you called me and said "We have a problem.

4    Mr. Schneider's asked for all these documents and we don't

5    know what to do," you're already doing the things that I would

6    ask you to do to try to work through it.

7         So, Mr. Schneider, I'll take you up on your idea

8    that just go ahead and -- again, you don't need to repeat.  It

9    doesn't need to be another 30 pages, just -- you know, just

10   list these categories for me.  And the fourth one just --

11   there's no reason to skip the very last one.

12        MR. SCHNEIDER:  Yeah.  This one's a little bit

13   different --

14        THE COURT:  All right.

15        MR. SCHNEIDER:  -- and it's my understanding that

16   this occurred before Mr. Phillips' involvement, but he may

17   want to address it since he is speaking on behalf of

18   Louisville today.

19        It's my understanding from a review of the Kentucky

20   Attorney General opinion regarding an open records request

21   that was made either by a newspaper or a television station.

22   I can't remember which as I'm standing here, Your Honor, and I

23   apologize for that, but I do believe it was for a newspaper.

24        That sometime during the search of responsive

25   records related to that open records request and some, I

1    guess, filings with the Attorney General's Office on both

2    sides, for Louisville and the media outlet, as to whether or

3    not, you know, certain materials were going to be produced

4    related to that open records request -- and the open records

5    request was about, you know, this whole issue that we're here

6    trying today.

7              THE COURT:  And I'm sorry.  The request was directed

8    to Louisville Metro?

9              MR. SCHNEIDER:  To Louisville from a media

10   organization.

11             THE COURT:  Okay.  I thought I heard mention of the

12   Attorney General's Office and -- did I just mishear that?

13             MR. SCHNEIDER:  Yeah.  It was my understanding the

14   Attorney General issued an opinion on this.

15             THE COURT:  Oh, I'm sorry.  There was an opinion on

16   the open records request.

17             MR. SCHNEIDER:  Uh-huh.

18             THE COURT:  Yeah.  Okay.  So continue.

19             MR. SCHNEIDER:  So during the briefing of that -- of

20   the dispute that led to that issue -- that -- that opinion

21   being issued by the Attorney General -- and it's my

22   understanding that Louisville has appealed that Attorney

23   General opinion.

24             But during the briefing of that, it came to light

25   that Louisville Metro had a folder containing approximately

1    9,000 pages of documents on one of its computers that was

2    responsive and related to the investigation into the abuse

3    that apparently some of its investigators had kept that and

4    put that on there.

5         Now, this was -- it's my understanding it was

6    discovered in 2019; this folder was.  And Louisville had

7    previously believed that this folder was no longer in their

8    possession because when apparently the FBI came in and teamed

9    up with Louisville and proceeded with their investigation in

10   their criminal proceedings against Betts and Wood, that that

11   folder, that information, was taken off the computer and sent

12   over to the FBI and it was no longer in Louisville's

13   possession at that time, which I believe was back in 2017.

14        However, Louisville later discovered that that

15   wasn't the case; the folder was still in their possession.

16   Louisville still had it.  Louisville still had control over

17   it.  And the issue is is we requested that kind of stuff in

18   discovery.  We requested information about the investigation,

19   we requested stuff about our clients, we requested stuff about

20   the Defendants Betts and Wood.

21        And without informing our office and without

22   informing this Court, it's my understanding the FBI came in

23   and Louisville and the FBI worked to remove that folder from

24   Louisville's system including any backups of that folder and

25   took it away and took it outside of Louisville's possession.

1   And I'll let Louisville explain that so we can address that

2   issue.

3         I'm concerned about that and the reason I'm

4   concerned about it is because it was in Louisville's

5   possession at that time and they should have give us a head's

6   up on that when they found it irrespective of what was going

7   on with the open records request during the middle of a civil

8   lawsuit involving seven cases that this centers around, and

9   without our knowledge or an opportunity for us to ask this

10  Court for any relief on that, it was -- it was removed.

11        It is my understanding -- and Mr. Phillips may be

12  able to address this -- that that folder was a composite of

13  information that Louisville still has in its possession, so

14  maybe that information can still be composited again by

15  Louisville, but we're talking about 9,000 documents that at

16  some point somebody inside Louisville decided "Hey, these are

17  important and relevant and -- you know, if there's

18  information, then we got to take it and put this in a folder."

19        But the concern that I have is that that folder,

20  that electronic folder, that I believe would be relevant to

21  this case or at least discoverable is no longer in

22  Louisville's possession and we weren't told about it.  And it

23  may be that it is protected by 6(e).  And, you know, that --

24  that's my concern, Your Honor, and I wanted to bring that up

25  because we may end up pushing forward on this.

1    One of the things we may do is sit down with
2    Louisville's IT department and say, "Okay.  What did you-all
3    do?  How did this information that was on your system in
4    September of 2019 get removed?  Who removed it?  Where did it
5    go?  When you removed it, did you remove it remove it or did
6    you just remove it?"

7    Because if they were doing rolling backups of their
8    system, it should be on their -- on their backup.  If they
9    were doing -- you know, if the FBI came in and said, "We're
10   taking the folder and we're taking the backup," how far back
11   into the backups did they go into and get rid of it?  Is this
12   really outside of their possession or not?  I don't know about
13   that, Your Honor.  I just wanted do address this issue today.

14   THE COURT:  Sure.  Sure.  I understand.  So let me
15   ask one point of clarification.  There was -- you believe --
16   and obviously, Mr. Phillips, I want to hear from you too, but
17   you believe, Mr. Schneider, that there was a time when
18   Louisville believed that the documents were no longer in its
19   possession but actually were but now have actually been
20   removed -- and you got to put air quotes on "removed" when
21   you're talking about a computer because is it really gone or
22   not.  But you believe that they were under the mistaken
23   impression the documents were -- had been removed but now they
24   have in fact been removed by the FBI or in conjunction with
25   the FBI.  Is that a fair paraphrase of what you think

1  happened?

2          MR. SCHNEIDER:  Yes.  That is a fair paraphrasing of

3  what has been represented to me --

4          THE COURT:  Okay.  All right.

5          MR. SCHNEIDER:  -- as happening.

6          THE COURT:  Understood.  And, you know, I want to

7  make one observation before I hear from you, Mr. Phillips, in

8  that, you know, I'm less concerned about a folder and more

9  concerned about the documents that are in it.  And I'll

10 probably cause everyone down in our IT department right now to

11 shutter when I say this, but, you know, to me a folder is a

12 file cabinet.  If the FBI came in and put the documents down

13 on the floor and took the file cabinet away, I really don't

14 care.

15         And so I think the first question is to the extent

16 there is agreement on the discoverability of these documents,

17 can they be produced now?  And, you know -- and you haven't

18 said the "s" word, but, you know, we don't -- we don't need to

19 go down spoliation path unless and until the documents are

20 actually unavailable, so I would -- hopefully we can keep the

21 focus for now at least on can they -- can this folder be

22 resuscitated or can we identify what documents were in the

23 folder.  Mr. Phillips?

24         MR. PHILLIPS:  And that's why I started all my

25 remarks with the I think this Rule 6(e) grand jury issue

1    permeates everything we're talking about because at a minimum

2    it seems to me the FBI has taken the file folder and its

3    backup and it has it and it possesses it so it's not lost.

4    It's not gone.  I mean, somebody has it.  And then we have in

5    excess of 9,000 documents that we're going through that have

6    been pulled off of Louisville Metro's system, so it may be

7    that these materials that Mr. Schneider's talking about are

8    part of what we're in the process of going through anyway.

9            So we're working through that particular issue, but,

10   again, that's why I went back to, you know, I -- this 6(e)

11   issue just keeps putting its nose under the tent of all of

12   this stuff.

13           THE COURT:  Right.  Well, again, this is

14   preliminary.  I don't mean it to be definitive.  This strikes

15   me -- this subcategory strikes me of -- of a category of

16   documents under this general grand jury heading.  The fact

17   that the FBI thought these documents were important and took

18   these documents, I don't think that imbues them with some --

19   the documents that is -- with some sort of protection because

20   they were just -- by the way they have been described by

21   you-all, they were documents that Louisville Metro had in

22   its -- to coin a phrase -- that Louisville Metro kept in the

23   ordinary course of its business.

24           And the FBI thought that they were -- the fact that

25   the FBI wanted them, needed them, chose to take them I don't

1    think casts any light one way or the other on the

2    discoverability of those items, so -- but I understand the

3    concern and I certainly don't fault you-all for raising it.

4         If you would -- I don't know that there's anything

5    different to do other than go ahead and include this as, you

6    know, yet another category that is subject to this analysis

7    that I'm going to do.

8         MR. PHILLIPS:  Right.  Understood.

9         THE COURT:  All right.  Does that make sense?

10        MR. PHILLIPS:  It does.

11        THE COURT:  Okay.  All right.  So, Mr. Schneider,

12   anything else just more -- either on this issue or just more

13   broadly to cover today?

14        MR. SCHNEIDER:  Just on that issue about delete and

15   delete and delete and stuff.  I would just -- and I'm -- I'll

16   state this for Mr. Phillips and I'll talk to him and do it in

17   writing as well.  I just need some type of assurances that,

18   you know, if they were -- if this folder existed in 2019 and

19   the FBI came in at that time and they removed the folder in

20   its existing form but also deleted it off of backup, did they

21   go through any and all available backups?

22        Because if this folder existed from 2017 through

23   2019 and there were multiple backups done during that time and

24   the folder didn't change its contents or change what was in

25   it, you know, for those two years, there may be multiple

1    backups of that.

2           And before I have to jump in in a Rule 30(b)(6)

3    deposition of an IT representative and sit down with somebody

4    in their IT department and spend, you know, an hour doing that

5    and discussing with them their different file structure, I

6    understand there are concerns about Rule 6(e), but somebody in

7    their IT department ought to be able to step up and say,

8    "Yeah, we deleted it and the FBI came in and deleted it, but

9    we can get that back" or "We can't get that back" or, you

10   know, explain it in more detail at least to my office -- not

11   necessarily this Court yet but at least to my office, "Yeah.

12   We're" -- "There's no way we're getting this back," that type

13   of deal.

14          THE COURT:  Yeah.  I understand that concern and I

15   largely agree where it, but I see that as step two.  You know,

16   I think step one, get the documents -- again, assuming that

17   there's agreement that they should be -- that they're

18   discoverable otherwise, get the documents, assuage any

19   concerns or rely on an order from me on the grand jury issue,

20   get them produced.  That's step one.

21          Step two, if that can't be done -- well, inherent in

22   step one is some statement -- you know, some certification by

23   you-all these are the same -- by Louisville Metro -- these are

24   the same documents.  And obviously I trust and assume that

25   you're going to do that.  And to the extent that you're

1    missing some documents, you're going to describe those

2    sufficiently so Mr. Schneider can know what he got and what he

3    didn't get, so that's kind of step 1a and 1b.

4           And then to the extent there are documents that are

5    irretrievable -- still I think I would put yet another step in

6    there.  Think about, talk about -- I don't know how responsive

7    the FBI is to open records request, but, you know, perhaps

8    open a line of communication with either the FBI or with the

9    U.S. Attorney's Office to see if those documents can be got

10   another way.

11          Listen, sometimes we have to deal with spoliation,

12   nobody likes it, but sometimes it's got to be done, but

13   that -- spoliation is premised on the unavailability of the

14   documents.  And then you get to the other questions of who

15   knew what, when they did what and when did they do it.  So if

16   we need to address those things, we'll address them, but let's

17   have that be step three.  Does that make sense, Mr. Schneider?

18          MR. SCHNEIDER:  It does, sir.

19          THE COURT:  All right.  Okay.  Mr. Phillips, do you

20   think we have enough of a plan on this issue?

21          MR. PHILLIPS:  I believe we do.  But I just want to

22   make it clear -- I don't think there's this suggestion, but

23   there was no knowing, withholding, hiding, deleting of any

24   materials relevant to this case at all, so I just want to make

25   sure that that's clear, but we're going to keep working on

1  pulling the information that we can; finding it and getting

2  through it.

3  THE COURT:  Understood.  We'll burn that bridge when

4  we get to it.  All right.  So more broadly, anything else to

5  cover today, Mr. Schneider or Ms. Cordes?

6  MR. SCHNEIDER:  Not from me, sir.

7  THE COURT:  All right.  Mr. Phillips, while --

8  because you're at the podium, anything else?

9  MR. PHILLIPS:  No, Your Honor.  I've used my

10  allotted time.  I yield.

11  THE COURT:  All right.  And, Ms. Frye or Ms. Taylor,

12  you-all have anything else?  I know he's the senior guy

13  standing at the podium, but I'm done making assumptions about

14  who's speaking up on behalf of which clients.

15  You know, there's a district judge -- I need to do

16  some research and figure out who this is so I can talk about

17  him in more detail, but there's an -- I believe he might be a

18  senior status judge and I feel like he's a Third Circuit or

19  Second, up in that direction, who requires the junior lawyer

20  to speak up at a hearing.  He -- I mean, it's a rule; the

21  junior lawyer will handle the argument.

22  I don't think I'm going to do that, but I like the

23  idea because the way our profession has developed -- it's not

24  always the case, of course, but the junior lawyer is more

25  likely to either be female or a minority, and so by just

1  deferring automatically to the senior person, you're

2  inadvertently, you know, deferring to the older white dude,

3  not that there's anything wrong with being of a certain age,

4  but that's -- there's a point to me calling on each of you.

5  All right.  Ms. Petitt -- I'm just going to go down the list

6  here.  Ms. Petitt, anything that you want to raise?

7           MS. PETITT:  No, Your Honor.  Thank you.

8           THE COURT:  All right.  Thank you.  Mr. Dilbeck?

9           MR. DILBECK:  No, Your Honor.  Thank you.

10          THE COURT:  All right.  Good morning.  Ms. Campbell

11  or Mr. Brammell, anything further?

12          MR. BRAMMELL:  No, Your Honor.

13          THE COURT:  See what I did there; called on both of

14  you.  All right, Mr. Palmer?

15          MR. PALMER:  Nothing further, Your Honor.

16          THE COURT:  There you are.  Thank you.

17  Mr. Sitlinger, anything else?

18          MR. SITLINGER:  No, Your Honor.

19          THE COURT:  All right.  Mr. Gary?

20          MR. GARY:  No, Your Honor.

21          THE COURT:  All right.  Mr. Murphy or Mr. Barton?

22  Oh, do we have a third person whose name is not highlighted?

23          MS. PHELPS:  Yeah.  Carolyn Phelps also with Stites

24  and Harbison, Your Honor.  Nothing further from us.

25          THE COURT:  I'm sorry.  Did you say Phelps?

1          MS. PHELPS:  Yes.

2          THE COURT:  I didn't have you on my list.  Okay.

3   All right.  You got that, I assume, April?  You've got

4   everything.  All right.  Last but not least, Mr. Klausing,

5   anything?

6          MR. KLAUSING:  No, Your Honor.

7          THE COURT:  All right.  So -- okay.  It's been very

8   productive.  I appreciate everybody's time.  Appreciate

9   everybody's patience.  I know I've said it before, but I'm

10  going to say it one more time, I really appreciate the way

11  that you guys are dealing with each other.  Keep up the good

12  work, but if there are problems or issues that I can help you

13  work through, just let us know.

14         Anyone can email Theresa, copy everybody else, say

15  "We've got an issue to discuss" or "We're ready to discuss

16  settlement" and we'll get on the phone, all right?  Okay.  So

17  I will let -- I'll excuse you-all and finally take my 11:00

18  o'clock hearing.  Thank you.

19         (Discussion off the record.)

20         THE COURT:  Hang on, folks.  I forgot two things.

21  Okay.  Sorry.  There are two other things I wanted to ask real

22  quick.  I don't think it will be an issue.

23         The joint motion that we talked about for -- asking

24  for a change in the scheduling order -- I like to have a

25  deadline for everything.  How long do you think it's going to

1   take, Ms. Cordes -- I guess I'm asking you -- to confer with

2   everybody and get that motion filed?

3          MS. CORDES:  I mean, I would say a week 'cause it's

4   just dates that we're talking about.  Next Friday.

5          THE COURT:  That cause anybody to flinch or pass out

6   over here on the -- okay.  All right.  Next Friday?

7          MS. CORDES:  Yes.

8          THE COURT:  Okay.  Let's do that.  And on the McNary

9   motion -- on the McNary issue, there is a motion to quash.  I

10   held briefing in abeyance on that.  Is there any reason to do

11   anything -- I could dismiss it or deny it rather without

12   prejudice, but it's not killing me to have it sitting there

13   for a little bit, so -- Mr. Noll?

14          MR. NOLL:  Your Honor, I'd like to leave it active

15   and we can continue to try to work this out.  I don't know how

16   the Court wants to -- if the Court wants to set a deadline in

17   which case the plaintiff's counsel would file a response or

18   else we can just -- I can just -- we can notice the Court if

19   we can't reach a resolution.

20          THE COURT:  Rather than a deadline for a response,

21   why don't I ask you to -- the two of you-all and anyone else

22   that needs to be involved to file a joint status report just

23   letting me know it's been resolved, it's not quite resolved,

24   or we need a ruling or just giving us an update 30 days from

25   today?

1          MR. NOLL:  That sounds fine.  Thank you, Your Honor.

2          MR. SCHNEIDER:  That's fine, Your Honor.

3          THE COURT:  All right.  Outstanding.  All right.

4     Now we're done.

5     (Proceedings concluded at 11:46 a.m.)

6                    C E R T I F I C A T E

7        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

8     THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

9

10
          s/April R. Dowell              12/8/20
11    Official Court Reporter, RMR, CRR          Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25